UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
J.B., individually and on behalf of K.B.,

                          Plaintiffs,                        **MEMORANDUM AND ORDER**
                                                                                     16-CV-398 (RRM) (RLM)

      -against-

THE NEW YORK CITY DEPARTMENT OF
EDUCATION,

                          Defendant.
------------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

        On April 15, 2015, plaintiff J.B. (the "Parent") commenced this action on behalf of her child, K.B., pursuant to the Individuals With Disabilities Education Improvement Act, 20 U.S.C. §1400 *et seq.* ("IDEA"). (Compl. (Doc. No 1.) The Parent alleges that the New York City Department of Education ("DOE") failed to provide a "free and appropriate public education" ("FAPE") for the 2014–2015 school year, and that the Parent's placement of K.B. at a private school was the least restrictive environment available to meet her needs.

        On January 20, 2015, the Parent filed a due process complaint seeking tuition reimbursement for K.B.'s attendance at the Rebecca School for the 2014–2015 school year. (*Id.* at 515.) On July 28, 2015, an Impartial Hearing Officer ("IHO") ruled against the Parent and found that K.B. was provided a FAPE. (*Id.* at 31–53.) The Parent appealed to the New York State Education Department Office of State Review, and on November 4, 2015, the State Review Officer ("SRO") affirmed the IHO's decision. (*Id.* at 6–29.) The Parent now challenges the SRO's decision in this Court.

        Before the Court are the parties' cross-motions for summary judgment. For the reasons set forth herein, the Parent's motion for summary judgment (Pet'r Mem. (Doc. No. 24)) is

denied, and the DOE's cross-motion for summary judgment (Def. Mem. (Doc. No. 23)) is granted.

## BACKGROUND

### I. The IDEA

The IDEA provides federal funds to states that assure all children with disabilities the right to a FAPE. 20 U.S.C. §§ 1412(1), 1415. A FAPE must include special services tailored to meet the child's particular needs. *See Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998); 20 U.S.C. § 1401(a)(18). For an IEP to be adequate under the IDEA, the IEP must be likely to produce progress rather than regression and afford "an opportunity greater than mere trivial advancement." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012) (internal quotation marks omitted). However, the IDEA does not require the IEP to furnish every special service necessary to maximize each child's potential. *Id.*

New York receives federal funds under the IDEA, and, therefore, must comply with its requirements. Accordingly, the DOE must, at least annually, set forth the student's particular needs – and the services required to meet those needs – in an IEP that includes descriptions of: (1) the student's present levels of academic achievement and functional performance; (2) annual goals, including short-term instructional objectives; (3) how the student is progressing toward these annual goals; (4) the special education, related services, and supplementary aids and devices that the student will receive; (5) the extent to which the student will be able to participate in a regular educational program; (6) the proposed services' projected initiation date and duration; and (7) objective criteria, evaluation procedures, and schedules for determining, on at least an annual basis, whether the student is achieving his instructional objectives. 20 U.S.C. § 1414(d).

## II. K.B.'s Medical and Educational History

The following facts are not in dispute. During the relevant period for purposes of this litigation, 2014–2015, K.B. was 15 years old. K.B. was first diagnosed with autism in 2008, and she presents with a variety of severe deficits. (*Id.*) For example, K.B. has developmental delays, which require full modification of her education curriculum in terms of depth, breadth, and pacing of curricular activities. (*Id.* at 625.)[1] She presents with deficits in all areas of language and communication, visual-spatial perception, sensory processing, and oral motor, fine motor, and gross motor skills. (*Id.* at 599–620.) At the time of the CSE meeting, K.B. was not yet fully toilet trained. (*Id.* at 624.)

K.B. requires adult assistance to succeed in a school setting. In order to be successful in a classroom, K.B. needs a sensory diet at least every two hours. (*Id.* at 468, 604, 615.) For example, she requires brushing protocol, joint compression, and walking on a treadmill to prevent dysregulation. (*Id.*) When surprised by a loud noise, K.B. physically "freezes" and becomes unsure of depth perception. (*Id.* at 468, 599, 611.) In addition, K.B. requires an oral-motor protocol to avoid choking. (*Id.* at 477, 483, 608, 619.)

Due to K.B.'s lack of progress from kindergarten through eighth grade, the Parent filed a due process complaint for the 2012–2013 school year. (*Id.* at 255.) On May 2, 2013, the DOE authorized the Parent to place K.B. in a state-approved private school. (*Id.* at 448.) On July 3, 2013, the Parent placed K.B. at the Rebecca School, and the DOE funded such placement for the 2013–2014 school year. (*Id.* at 259.)

## III. IEP for the 2014–2015 School Year

---

[1] For ease of reference, citations to the Administrative Record utilize the Electronic Case Filing System ("ECF") pagination.

3

In June 2014, K.B's Committee on Special Education ("CSE") met to establish her IEP recommendation for the 2014–2015 school year. (*Id.* at 621–22, 641.) The CSE team included: the Parent; K.B.'s teacher at the Rebecca School, Sara Gerstein; social worker at the Rebecca School, Bonnie Waring; DOE school psychologist and district representative, Rose Fochetta; and DOE special education teacher, Feng Ye. (*Id.*) The two DOE members recommended, and the CSE adopted, a twelve-month, 6:1+1 program (6 students, 1 teacher, and 1 aide) in a District 75[2] program for students with disabilities. (*Id.* at 642.) The CSE further recommended one individual 45-minute session and one group 45-minute session of occupational therapy per week, two individual 45-minute sessions and one group 45-minute session of speech-language therapy per week, two individual 45-minute sessions of physical therapy per week, adapted physical therapy twice per week, travel training once per week, one individual 45-minute session of counseling per week, and one parent counseling and training session for 60 minutes per month. (*Id.* at 627–628.) The IEP recommended the use of visual cues, teacher prompting, hand over hand support for writing, and a sensory diet. (*Id.* at 625.) The IEP included twelve annual goals, each with short-term objectives and progress checks, addressing the development of basic literacy, math, motor, language, and visual spatial skills. (*Id.* at 627–632.)

On June 10, 2014, the DOE sent the Parent a prior written notice summarizing the IEP. (*Id.* at 644.) On June 16, 2014, the DOE sent the Parent a school location letter proposing PS Q177[3] to implement K.B.'s IEP for 2014–2015 year. (*Id.* at 648.) The location letter also provided information about how the Parent could visit K.B.'s placement school. (*Id.*) On June

---

[2] District 75 provides citywide educational, vocational, and behavior support programs for students who are on the autism spectrum, have significant cognitive delays, are severely emotionally challenged, sensory impaired and/or multiply disabled. District 75 consists of 58 school organizations, home and hospital instruction and vision and hearing services. (Def. Mem. at 4) (*citing* NYC DOE, http://schools.nyc.gov/Academics/SpecialEducation/D75/default.htm)

[3] PS Q177 was a District 75 school. *See*, FN 2, *supra*.

4

20, 2014, the Parent sent a letter complaining that she was unable to reach the "placement officer" at PS Q177 in order to arrange a visit before leaving for vacation. (*Id.* at 456.) The Parent added:

> If the CSE does not work with me to provide an appropriate educational program, I will be making a unilateral placement in a private school and will seek to recover the cost of tuition and related expenses from the New York City Department of Education.

(*Id.*) The Parent unilaterally re-enrolled K.B. in the Rebecca School for the 2014–2015 school year. (*Id.* at 461.) On August 26, 2014, the DOE sent a letter informing the Parent that it deemed the program and placement at PS Q177 to be appropriate for K.B. (*Id.* at 460.) On January 20, 2015, the Parent sought review before an impartial hearing officer. (*Id.* at 515.)

## IV. IHO and SRO Hearings

The IHO presided over three days of testimony between April 21, 2015, and June 3, 2015. (*Id.* at 125–230.) On July 28, 2015, the IHO issued his decision finding that the DOE offered a FAPE to K.B. for the 2014–2015 school year. (*Id.* 31–53.) The IHO found that the IEP reflected the evaluative information available to the CSE, had sufficiently clear and measurable goals, and provided sufficient support to meet K.B.'s needs. (*Id.*) Specifically, the IHO found that the IEP provided sufficient direct intervention and support for K.B.'s management needs, including "hand over hand support for writing" and "teacher prompting." (*Id.* at 50.) The IHO further noted that the IEP contained sufficient annual goals in connection with K.B.'s management needs. (*Id.* at 51.) In addition, the IHO found that the CSE's recommendation exceeded the amount of occupational therapy the student received at the Rebecca School during the 2013–2014 school year. (*Id.*) With respect to K.B.'s oral motor needs, the IHO found that a speech-language therapist could develop an "oral motor protocol" for the student and that, therefore, any failure to specify a "protocol" in K.B.'s IEP did not rise to

5

a denial of a FAPE. (*Id.*) Ultimately, the IHO concluded that the June 2014 IEP offered K.B. the opportunity to progress in the least restrictive environment available to meet her needs. (*Id.* at 53.)

On November 4, 2015, the SRO issued a detailed decision affirming the IHO's decision. (*Id.* at 6–29.) First, the SRO found that the IEP provided sufficient annual goals and short-term objectives. (*Id.* at 10-12.) Procedurally, the SRO found that even if the IEP's annual goals were not finalized until after the meeting, "the parent's opportunity to participate in the CSE meeting was not infringed" because she was involved in the development of the IEP. (*Id.* at 10–11.) Substantively, the SRO found that the IEP's annual goals were sufficiently wide-ranging, and complete with required criteria for evaluating progress. (*Id.* at 11.) To the extent that the annual goals were overbroad, the SRO found that the IEP's "corresponding short-term objectives mitigate[d] the defect by providing sufficient specificity to evaluate the student's progress." (*Id.*) Specifically, to the Parent's contention that the IEP did not contain any fine-motor goals, the SRO found that it included "14 short-term objectives that addressed fine motor needs" and "hand over hand support for writing." (*Id.* at 12.) In turn, the SRO found that "the evidence in the hearing record demonstrates that the annual goals in the June 2014 IEP, combined with the corresponding short-term objectives, were adequate to address the student's needs and provide for an appropriate method of measurement or evaluative procedure." (*Id.* at 12.)

Second, the SRO found that "a 12-month school year program in a 6: 1+1 special class placement, together with adapted physical education, travel training, annual goals and short-term objectives, related services, and strategies to address the student's management needs" was "reasonably calculated" to provide K.B. with a FAPE. (*Id.* at 15.) That is, while a 6:1+1

program may not be "ideal" for K.B in the eyes of the Parent, it reflected a "reasonable compromise to achieve a sufficient amount of support in the classroom" for K.B. (*Id.* at 13–14.)

Third, the SRO found that the IEP provided for adequate occupational therapy and sensory support. (*Id.* at 16.) That is, it "contained sufficient information regarding the student's sensory needs, included appropriate OT goals, reflected an increase in the duration of OT services, and, while failing to detail a location for OT services with specificity, recommended sufficient and appropriate OT services for the student to receive educational benefit." (*Id.*)

Fourth, the SRO addressed the Parent's contention that the IEP failed to include oral-motor exercises that sufficiently address K.B.'s propensity to choke. (*Id.* at 18.) The SRO found that while the IEP did not address any specific exercise to address choking, it did include an "oral motor protocol" and three speech-language therapy sessions per week. (*Id.*) Based on these recommended exercises, the SRO found that the failure to directly address choking did not rise to a denial of a FAPE. (*Id.* at 19.)

Fifth, the SRO addressed whether the IEP's failure to recommend music therapy, in lieu of traditional counseling to address "social/emotional and internal thoughts," amounted to denial of a FAPE. (*Id.* at 19.) The SRO found that while K.B. "may have benefitted from music therapy due to her love of music," she could also "initiate interaction, share attention, and communicate with peers and adults outside of musical activities." (*Id.* at 20.) Thus, denial of the Parent's preferred method of socio-emotional counseling did not constitute denial of a FAPE. (*Id.*)

Sixth, the SRO found that the IEP provided sufficient "transition services" – goals to prepare K.B. for life post-education. (*Id.* at 19.) Here, the SRO found that the CSE team considered the results of a March 2013 vocational assessment in tailoring "long-term goals for

7

living, working, and learning as an adult." (*Id.* at 20.) The IEP further outlined K.B.'s need for "adult support with shopping, traveling, and financial management," and it "reflected the parent's desire for the student to have additional schooling after high school." (*Id.* at 20.) To these ends, that IEP recommended, *inter alia*, that K.B.'s placement school implement:

> (1) instruction to facilitate following 2-step novel directions;
> (2) related services to address dressing and toileting skills; and
> (3) community experiences to facilitate travel training and skills related to identifying strangers and helpers in the community.

(*Id.* at 21.) The IEP also included corresponding goals and short-term objectives. As such, the SRO found that "the June 2014 IEP adequately set forth the student's transition needs and post-secondary goals." (*Id.*)

Finally, the SRO addressed the Parent's allegations that the DOE failed to assist her in reaching K.B.'s placement school to schedule a visit. (*Id.*) The SRO found that "the parent's only claim relating to the assigned public school site arises from her difficulty reaching the school to schedule a visit and the district's failure to offer help in contacting the school after the parent's letter to the district dated June 20, 2014." (*Id.*) However, the SRO noted that the DOE sent the Parent a letter outlining the name, number, and address of a placement officer to help the parent arrange a visit. (*Id.*) In turn, the SRO found that the Parent was provided with the relevant information about K.B.'s placement school, and thus the parent's claim that the district impeded her opportunity to participate in the decision-making process concerning the student's educational program or placement is without merit." (*Id.* at 21.)

Based on the forgoing analysis, the SRO concluded that the June 2014 IEP offered K.B. the opportunity to progress in the least restrictive environment available to meet her needs. (*Id.*)

## STANDARD OF REVIEW

A summary judgment motion in an IDEA case serves as a "pragmatic procedural mechanism for reviewing" an administrative decision. *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted); *see also L.K. v. New York City Dep't of Educ.*, 2011 WL 127063, at *5 (stating that IDEA summary judgment motions are "in substance an appeal from an administrative determination, not summary judgment") (internal quotation marks omitted). The district court's standard of review is a "modified de novo review" of the administrative proceedings, based on the preponderance of the evidence. *L.K.*, 2011 WL 127063, at *5.

Summary judgment review in IDEA cases "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (U.S. 1982). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak*, 142 F.3d at 129 (internal quotation marks omitted). Deference is appropriate where the administrative reviews were thorough and careful. *Id.*; *accord M.H. v. New York City Dep't of Educ.*, No. 09-CV-3657 (LAP), 2010 WL 1904005, at *17 (S.D.N.Y. May 10, 2010), *aff'd*, 685 F.3d 217 (2d Cir. 2012).

The level of deference a court should extend depends on the quality of the SRO's opinion, while bearing in mind "the statutory context and the administrative judges' greater institutional competence on matters of educational policy." *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012). If a court concludes that "the SRO's determinations are

insufficiently reasoned to merit . . . deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court . . . to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges." *Id.*

In New York, the school district generally bears the burden of proof at an IHO hearing.[4] However, a parent "seeking tuition reimbursement for a unilateral parental placement [in a private school] shall have the burden of persuasion and . . . production on the appropriateness of such placement." N.Y. Educ. L. §4404(1)(c); *see M.H.*, 685 F.3d at 255 n.3.

## DISCUSSION

### I. The Procedural Adequacy of the June 2014 IEP

The Parent alleges that she was "[l]eft without any assistance from the CSE with respect to school placements." (Pl. Mot. at 19.) The Parent claims that she had difficulty contacting the IEP's recommended school and therefore was denied significant participation in the placement decision. However, as discussed below, the record makes clear that the DOE provided the Parent with clear guidance on how to contact K.B.'s placement school. As a consequence, the Parent's contention that she was left without assistance and denied significant participation is without merit.[5]

---

[4] The Supreme Court has held that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer v. Weast*, 546 U.S. 49, 62 (2005). Both the Supreme Court and the Second Circuit have declined to address whether this statutory burden-reallocation is permissible. *See id.*; *M.H.*, 685 F.3d at 255 n.3. The Second Circuit has held that where plaintiffs seek judicial review of an SRO's determination that an IEP was proper, plaintiffs bear the burden of proof. *See M.H.*, 685 F.3d at 255 n.3 ("Because the State Review Officers in the cases at bar concluded that the IEPs were proper, and the courts are bound to exhibit deference to that decision, the burden of demonstrating that the respective Review Officers erred is properly understood to fall on the plaintiffs.").

[5] In a related argument, the Parent alleges a procedural violation of the IDEA based on DOE's failure to comply with its own internal deadlines. However, this argument is unavailing. Failure to comply with internal deadlines, like any alleged procedural defect, does not by itself constitute a denial of a FAPE, or meaningful participation. *See R.B. v. N.Y.C. Dep't of Educ.*, No. 15-CV-6331 (DLC), 2016 U.S. Dist. LEXIS 65938, at *28–30 (S.D.N.Y. May 19, 2016) (failing to provide prior written notice of placement did not by itself result in prejudice to the parents). As

10

At the June 2014 CSE meeting in which the Parent participated, the DOE recommended a school within school District 75, which specializes in programs for autistic students. (*Id.* at 28.) On June 16, 2014, the DOE sent the Parent a letter specifically placing K.B. in PS Q177 within District 75. (*Id.* at 648). The letter explained that the Parent could visit the recommended school site and provided the name, telephone number, and address of an individual that the Parent could contact for assistance in arranging the visit. (*Id.*) In a June 20, 2014 letter to DOE, the Parent indicated she was "unable to reach the placement officer to schedule a visit to the recommended school" before her upcoming vacation. (*Id.* at 456.) The letter neither detailed the Parent's attempt to reach the school nor requested any help or additional information from DOE. (*Id.*)

Procedurally, under the IDEA, not every error in developing an IEP renders it inadequate. *Grim*, 346 F.3d at 381. Where a parent alleges a procedural defect in the development of an IEP, that violation must significantly impede the student's right to a FAPE, significantly impede the parent's opportunity to participate in the process, or cause a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E); *see R.E.*, 694 F.3d at 190; *W.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 138 (S.D.N.Y. 2006). Here, the Parent alleges that the DOE significantly impeded her right to participate in the IEP with respect to K.B.'s school placement. However, the record supports the SRO's conclusion that the Parent was not denied the opportunity to significantly participate. (Admin. R. at 26–30.)

Parents do not have a right under the IDEA to visit assigned school placement options either before the recommendation is finalized or prior to the school year. *See J.C. v New York City Dep't of Educ.*, No. 13-CV-3759 (PGG), 2015 WL 1499389, at *24 n.14 (S.D.N.Y. Mar. 31,

---

such, the Court agrees with the SRO's well-reasoned finding that given the Parent's extensive participation in developing K.B.'s IEP, and the communications between the Parent and the DOE regarding K.B.'s school placement, any breach of internal DOE protocol did not significantly impede the Parent's participation under IDEA. (Admin. R. at 28.)

2015). Rather, parents have the right to obtain information about a school sufficient to form a judgment about the placement process. *See R.B. v. N.Y.C. Dep't of Educ.*, 603 F. App'x 36, 39 (2d Cir. 2015) ("Parents are guaranteed only the opportunity to participate in the decision about a child's 'educational placement,' which 'refers to the general educational program – such as the classes, individualized attention and additional services a child will receive – rather than the bricks and mortar of the specific school.'") (quoting 20 U.S.C. § 1414(e)); *accord F.B. v New York City Dep't of Educ.*, No. 14-CV-3902 (PAE), 2015 WL 5564446, at *11–*18 (S.D.N.Y. Sept. 21, 2015); *V.S. v New York City Dep't of Educ.*, 25 F. Supp. 3d 295, 299–301 (E.D.N.Y. 2014); *C.U. v. New York City Dep't of Educ.*, No. 23-CV-5209 (DLC), 2014 WL 2207997, at *14–*16 (S.D.N.Y. May 27, 2014).

The record is clear that the Parent was able to significantly participate in the development of K.B.'s IEP, and the DOE notified the parent of K.B.'s school placement.[6] The Parent's procedural claim, then, depends on a Parent's right under IDEA to visit an assigned school placement before the recommendation is finalized. However, the IDEA affords no such right. *See J.C.*, 2015 WL 1499389, at *24 n.14. Given the SRO's carefully reasoned decision, and the ample support in the record for the SRO's conclusion, the Court finds that the Parent was not significantly impeded from participation in K.B.'s IEP and school placement. (*Id.* 26–30.)

---

[6] The Parent argues that, because the CSE meeting minutes include reference to a District 75 school, the program recommendation must have been made without any discussion of how the program would be implemented within a particular school. (Pl. Mot. at 19.) However, the CSE discussed a number of different class sizes and related services suitable for K.B, and the IEP reflects the Parent's input. (Admin. R. at 623, 624, 626, 639.) The record is clear that the CSE fulfilled its duty to "listen to the parents [to ensure an] opportunity to make objections and suggestions." *M.M. v. N.Y.C. Dep't of Educ.*, 583 F. Supp. 2d 498, 506 (S.D.N.Y. 2008) (internal quotation marks and original brackets omitted). The IDEA does not grant the right to select the placement school. *See F.B.*, 2015 U.S. Dist. LEXIS 125985, at *41–42 ("The crux of the right to meaningfully participate in the school selection process is the right 'to evaluate the school assignment, i.e., the right to acquire relevant and timely information as to the proposed school.'") (quoting *V.S. v. N.Y.C. Dep't of Educ.*, 25 F. Supp. 3d 295, 299 (E.D.N.Y. 2014)).

## II. The Substantive Adequacy of the June 2014 IEP

The Parent argues that the DOE failed to provide an IEP that complies with the substantive requirements of the IDEA. (Pl. Mot. 8–23.) As detailed above, a FAPE need not "maximize the potential" of disabled students. *Rowley*, 458 U.S. at 200. Rather, a FAPE but must be "reasonably calculated to enable the child to receive educational benefits." *Id.* at 206–07. DOE meets its obligations "if it provides an IEP that is 'likely to produce progress, not regression,' and that affords the student with an opportunity greater than mere 'trivial advancement.'" *Cerra*, 427 F.3d at 195 (quoting *Walczak*, 142 F.3d at 130).

Substantively, under the "*Burlington/Carter* test," courts will order a school district to reimburse parents who reject a proposed IEP and unilaterally enroll their child in private school where the school district failed to provide a FAPE ("Prong I"), the private school placement is appropriate ("Prong II"), and the equities warrant reimbursement ("Prong III"). *F.L. ex rel. F.L. v. New York City Dep't of Educ.*, No. 11-CV-5131 (RKE), 2012 WL 4891748, at *5 (S.D.N.Y. Oct. 16, 2012); *see Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985). A court need not consider Prong II or Prong III issues if it finds that the school district offered a FAPE under Prong I. *See T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009) ("Because we find that S.P.'s 2004–2005 IEP was neither procedurally flawed nor substantively deficient, we need not reach the issues whether the additional services provided by the parents were appropriate, or whether equitable considerations affect relief.") (internal citations omitted); *accord G.S. v. New York City Dep't of Educ.*, No. 15-CV-5187 (RA), 2016 U.S. Dist. LEXIS 127473, at *50–51 (S.D.N.Y. Sept. 19, 2016). In addressing Prong I of the *Burlington/Carter* test, a court must consider (1) whether the student's IEP was developed according to the IDEA's procedural

requirements, and (2) whether the educational plan set forth in the IEP was reasonably calculated to confer educational benefits on the student. *Walczak*, 142 F.3d 119, 129 (citing *Rowley*, 458 U.S. at 206–07).

In this case, the Court has reviewed each of the Parent's arguments and finds that the DOE's recommendation was reasonably calculated to provide K.B. with a FAPE for the 2014–2015 school year.

### i. The IEP Provided the Appropriate Level of Direct Teacher Instruction for K.B. to Achieve Some Educational Progress

The record provides ample support for the SRO's conclusion that a 6:1+1 program was reasonably calculated to provide a FAPE. While the Parent believes that an 8:1+3 ratio may be "ideal" for K.B., a 6:1+1 program would provide the appropriate level of instruction for K.B. to achieve some educational progress. (*Id.* at 18); *see A.D. ex rel. E.D.*, No. 12-CV-2673, (RA) 2013 WL 1155570, at *8 (S.D.N.Y. Mar. 19, 2013) ("[O]nce the CSE determined that a 6:1:1 classroom would be appropriate for the Student, it had identified the least restrictive environment that could meet the Student's needs and did not need to inquire into more restrictive options such as nonpublic programs.") While witnesses from the Rebecca School argued that K.B. required 2:1 teacher intervention, the SRO credited the DOE's witness, who recommended the 6:1+1 ratio. (*Id.* at 18.) The SRO noted that K.B. had not made progress throughout her public education in a 12:1:1 setting with a 1:1 paraprofessional, but had made significant progress in a private school's 8:1+3 class without a paraprofessional. (*Id.* at 18–20.) The SRO reasoned that the 6:1+1 class was designed for students "whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention," and, thus, the 6:1+1 size was "a reasonable compromise to achieve a sufficient amount of support in the classroom . . . ." (*Id.*)

14

Despite the Parent's contrary assertion, determining an appropriate class size is precisely the sort of policy judgment on which the Second Circuit has counseled courts to defer to the SRO. *Walczak*, 142 F.3d at 129; *see also M.H. v. New York City Dep't of Educ.*, No. 10-CV-1042 (RJH), 2011 U.S. Dist. LEXIS 17306, at *40 (S.D.N.Y. Feb. 16, 2011). Accordingly, the Court defers to the SRO's finding that a 6:1+1 class was the appropriate, least restrictive setting for K.B to achieve some educational progress.

### ii. The SRO Did Not Commit Clear Error in His Review of the Record with Respect to K.B.'s Oral Motor Deficits

The Parent alleges that the IEP inadequately accounted for K.B.'s oral motor deficits, thereby denying her a FAPE. Yet, the Parent acknowledges that the IEP includes an annual speech and language goal for K.B. to "improve her oral motor skills" through "engagement in a daily oral motor protocol." (Pl. Mot. at 12; Admin. R. at 630.) Furthermore, the Parent fails to acknowledge that the IEP also notes the need for an oral motor protocol to train K.B. to chew consistently and avoid overstuffing. (*Id.* at 624–630.) It is therefore clear that the IEP's annual goals accounted for K.B.'s oral motor deficits.

The Parent also argues that the IEP did not contain a sufficiently detailed oral motor protocol with specific exercises. (Pl. Mot. at 11.) However, the IEP recommended two 45-minute individual speech-language therapy sessions per week and one 45-minute group speech-language therapy session per week, complete with short-term goals, to address K.B.'s oral motor deficiencies. (*Id.* at 23, 623–24.) In addition, the SRO pointed to the IHO hearing testimony of K.B.'s Rebecca School speech-language pathologist, who noted that "oral motor protocol" was a term of art in speech-language services, and that any speech-language professional would understand what procedures to implement. (*Id.*)

15

Given the support in the record for the determination that the IEP adequately accounted for K.B.'s oral motor deficits, the Court defers to the SRO. *See Grim*, 346 F.3d at 382 ("[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of administrative officers."); *see also M.H.*, 685 F.3d at 244 ("[an SRO's] determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures."); *see also J.L. v. City Sch. Dist. Of City of New York*, No. 12-CV-1516 (CM), 2013 WL 625064, at *13 (S.D.N.Y. Feb. 20, 2013) ("In this Circuit, courts are reluctant to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress.") (internal quotation marks omitted).

### iii. The DOE Recommended Appropriate Occupational Therapy Services to Address K.B.'s Sensory Integration Disorder and Fine Motor Deficits

The Parent argues that K.B's IEP failed to either adequately address her sensory needs or include a sufficient amount of occupational therapy. (Pl. Mot. at 14.) However, as the SRO outlined, the IEP included a robust program of both sensory and occupational support.

The SRO found that the protocols outlined in the IEP adequately addressed K.B.'s sensory diet needs. (Admin. R. at 22.) The IEP specified that K.B. needed a five to ten minute sensory diet implemented every one-and-one-half to two hours. (*Id.* at 624.) It also included protocols for vestibular, tactile, and proprioceptive input. (*Id.* at 625.) As required by the IDEA, the IEP outlined annual and short-term goals to address K.B.'s sensory needs. For example, these objectives included improving K.B.'s coordination and sensory processing through a daily sensory diet. (*Id.* at 629–30.)

The SRO also found that the protocols outlined in the IEP adequately addressed K.B.'s occupational therapy needs. (*Id.* at 22.) Specifically, the IEP recommended one 45-minute

16

individual OT session and one group 45-minute OT session per week. (*Id.* at 632–33). In fact, the SRO found that the IEP recommendations actually increased the duration and frequency of services relative to what the Rebecca School had offered.[7] (*See id.* at 615, 632–33.)

Based on the forgoing support in the record, the SRO affirmed the IHO's decision that K.B.'s IEP provided an adequate sensory diet and occupational therapy program. As such, the Court finds that the preponderance of the evidence supports the SRO's determination, and the Court defers to the SRO's well-reasoned decision. *See Grim*, 346 F.3d at 382.

### iv. The DOE Recommended Appropriate IEP Goals and Objectives

An IEP must include a written statement of measurable academic and functional goals for how the student will progress throughout the year. *See* 20 U.S.C. § 1414(d)(l)(A)(i)(II); 34 CFR § 300.320(a)(2)(i); 8 NYCRR § 200.4(d)(2)(iii). Each annual goal must include the evaluative criteria, procedures, and schedules that will measure the student's progress. 8 NYCRR § 200.(d)(2)(iii)(b); *see* 20 U.S.C. § 1414(d)(l)(A)(i)(III); 34 CFR 300.320(a)(3). Here, the Parent argues that the June 2014 IEP failed to include sufficiently detailed goals and objectives. (Pl. Mot. at 16.) However, any deficiencies in the IEP's annual goals were obviated by specific, short-term objectives. As a consequence, the Court affirms the SRO's determination that the IEP outlined appropriate goals and objectives.

In this case, the IEP included eleven annual goals to address K.B's needs in academics, socio-emotional development, motor skills, speech-language skills, and pre-vocational skills. (*Id.* at 627–632). Each of those goals contained evaluative criteria, a method for evaluating progress, and an evaluation schedule. (*Id.* at 627–32.) Annual academic goals addressed K.B.'s literacy and math skills, number sense, and basic math concepts. (*Id.* at 628.) The

---

[7] The hearing record shows that, at the time of the June 2014 CSE meeting, the student was receiving one 30-minute session of individual OT and one 30-minute session of group OT at the Rebecca School. (*Id.* at 632–33.)

corresponding short-term objectives included turning pages in a book, identifying sight words, answering "wh" questions, counting with one-to-one correspondence, understanding "more" and "less," and following a schedule. (*Id.* at 627–28.) Annual counseling goals focused on socio-emotional functioning. (*Id.* at 16.) The corresponding short-term counseling objectives included recognizing negative emotions. (*Id.* at 627–28.) The IEP's gross motor skills goal specified nine corresponding short-term objectives, including improving bilateral coordination, core strength, and climbing stairs. (*Id.*) Speech-language goals focused on pragmatic language, oral-motor skills, functional life skills, and receptive language skills. (*Id.*) Twelve corresponding short-term objectives included peer interaction, maintaining eye contact, daily oral-motor protocol, following one and two-step directions, and answering "wh" questions about the classroom and community. (*Id.* at 630–31.)

The Parent also contends that the June 2014 IEP did not contain appropriate fine motor goals. (Pl. Mot. at 14.) However, the IEP included goals related to improving daily living skills, visual scanning and processing, and coordination and sensory processing. (*Id.* at 614, 619, 620.) The IEP also contained fourteen short-term objectives (e.g., toileting and dressing, closing buttons, snaps and zippers, and tying shoes) that addressed K.B.'s fine motor needs. (*Id.* at 614, 619, 620.) While the IEP does not include a fine motor goal for writing, an IEP does not need to identify annual goals for every deficit in order to provide a FAPE.[8] *See R.B. v. New York City Dep't of Educ.*, No. 12-CV-3763(AJN), 2013 WL 5438605, at *14 (S.D.N.Y. Sept. 27, 2013), *aff'd* 589 Fed. App'x 572 (2d Cir. Oct. 29, 2014); *J.L.*, 2013 WL 625064, at * 13. Here, the SRO found that, as a whole, the IEP was reasonably calculated to enable K.B. to receive educational benefits. (*Id.* at 17); *see Rowley*, 458 U.S. at 206–07; *Karl v. Bd. Of Educ.*, 736 F.2d 873, 877

---

[8] The IEP did, however, provide for hand over hand support for writing. (*Id.* at 625.)

(2d Cir. 1984) (finding that educational benefits flowing from an IEP must be determined from the combination of offerings). Here, the combination of annual and short-term goals in the IEP were adequate to address K.B.'s fine motor deficits.

The Parent fails to meet her burden to show that the IEP's annual goals were so overly broad as to deny K.B. access to a FAPE. When supplemented by short-term objectives outlining a student's path to progress, even overly broad annual goals do not by themselves constitute denial of a FAPE. *See A.D. v. New York City Dep't of Educ.*, No. 12-CV-2673 (RA), 2013 WL 1155570, at *10–*11 (S.D.N.Y. Mar. 19, 2013); *J.L.*, 2013 WL 625064, at *13. Here, the SRO found that the IEP's detailed short-term objectives provided the necessary clarity to supplement annual progress goals. Due to the ample support in the record for the SRO's carefully reasoned conclusion, the Court finds that the IEP provided adequate goals and objectives and, therefore, did not deny K.B. a FAPE.[9] *See P.K. v. New York City Dep't of Educ.*, 819 F. Supp. 2d 90, 109 (E.D.N.Y. 2011) (noting the reluctance to find denial of FAPE based on an IEP's failure to clearly identify annual goals or methods of measuring progress), *aff'd*, 526 Fed. App'x 135 (2d Cir. May 21, 2013).

### v. The Parent's Arguments Fail on Prong I of the Burlington/Carter Test

As noted above, under the *Burlington/Carter* test, courts will order a school district to reimburse parents who unilaterally enroll their child in private school where the school district

---

[9] The Parent also argues that some of the goals and short-term objectives were not appropriate given K.B.'s then-current functioning. For example, the Parent argues that because K.B. had not yet mastered "who" and "what" questions, it was unreasonable for the IEP to list answering abstract "where" and "why" questions on the IEP (Admin. R. at 617.) However, the Rebecca School progress report indicated that the student could answer "simple 'wh' ('who' and 'what') questions with visual support and restating the question" (*id.* at 613), which the SRO found justified the inclusion of the more abstract "wh" questions as short-term objectives. (*Id.* at 17.) Regardless, the SRO properly noted that "to the extent some [goals] could be deemed more ambitious, their inclusion does not result in a finding that the entire goal was inappropriate to meet the student's needs, particularly given the management strategies set forth in the June 2014 IEP that would be available to help the student succeed." (*Id.*); *see A.M. v. New York City Dep't of Educ.*, 964 F. Supp. 2d 270, 285 (S.D.N.Y. 2013). Finding ample support in the record, the Court defers to the SRO with respect to the substantive appropriateness of short-term goals.

failed to provide a FAPE ("Prong I"), the private school placement is appropriate ("Prong II"), and the equities warrant reimbursement ("Prong III"). *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985). Here, the Court finds ample support in the record for the SRO's decision that the Parent failed to meet her burden, and that the June 2014 IEP was reasonably calculated to provide K.B. a FAPE for the 2014–2015 school year. Having found each of the Parent's arguments unavailing under Prong I, it is "unnecessary to reach the second and third prongs of the *Burlington/Carter* test." *G.S.*, 2016 U.S. Dist. LEXIS 127473, at *50–51; *accord T.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009). The Court finds that June 2014 IEP was reasonably calculated to provide K.B. with a FAPE. Therefore, the Parent is not entitled to tuition reimbursement.

## CONCLUSION

For the foregoing reasons, the Parent's motion for summary judgment (Doc. No. 24) is denied, and DOE's cross-motion for summary judgment (Doc. No. 23) is granted. The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

SO ORDERED.

Dated: Brooklyn, New York
March 17, 2017

s/Roslynn R. Mauskopf
_____
ROSLYNN R. MAUSKOPF
United States District Judge